UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TIMOTHY B. WILKS,

                    Plaintiff,

          v.                                          Case No. 15-C-1053

WELCOME ROSE,
ANTHONY MELI,
LINDA ALSUM-O'DONOVAN,
JOHN DAHLKE,
CRAIG CODA, and
JAMES MUENCHOW,

                    Defendants.

DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT (DOC. 20), DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE
PLEADINGS (DOC. 24), GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. 26), AND DISMISSING CASE

          Plaintiff, Timothy B. Wilks, is proceeding on claims that the defendants' decisions

to deny him the opportunity to possess and mail postcards for use in marketing his

published book and/or to sell his published book outside the Waupun Correctional

Institution violate his First Amendment rights.[1]  This matter is now before the court on

plaintiff's motion for judgment on the pleadings and cross motions for summary judgment.

I. PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

          On September 13, 2016, plaintiff filed a motion for summary judgment and a motion

for judgment on the pleadings.  In the motion for judgment on the pleadings, plaintiff argues

that the court should strike defendants' answer (filed March 18, 2016) because it violated

---

[1] This was the only claim on which the court allowed the plaintiff to proceed at screening. (Doc. 9.);
28 U.S.C. § 1915A.  To the extent plaintiff makes arguments regarding any other claims, they are irrelevant
to this case.

Federal Rule of Civil Procedure 8(b). He cites several provisions of Federal Rule of Civil Procedure 12. While Rule 12(c) addresses motions for judgment on the pleadings, plaintiff really wants the court to strike defendants' answer as deficient under Rule 12(f).

As an initial matter, a party must bring a motion to strike under Rule 12(f) "within 21 days after being served with the pleading." Plaintiff suggests that the court's Scheduling Order, of March 22, 2016, modified that deadline by providing a later deadline for motions under Rule 12 and Rule 56. However, the Scheduling Order mentions "motions to dismiss" under Rule 12, not motions to strike. (Doc. 11.) In any event, for the reasons discussed below, defendants' answer is sufficient.

Plaintiff submits that defendants failed to "state in short and plain terms" their defenses to plaintiff's legal claims, which were set forth in paragraphs fourteen to eighteen of plaintiff's complaint. *See* Fed. R. Civ. P. 8(b)(1)(A). He argues that he was forced to speculate regarding defendants' defenses in pursuing summary judgment because the answer was insufficient. Regardless, notice pleading under the Federal Rules of Civil Proceedings does not require parties to plead legal theories, and there is no indication that plaintiff served formal discovery requests in this case, or informal inquiries about the specifics of defendants' defenses.

Plaintiff also contends that defendants' affirmative defenses were conclusory and insufficient. However, the affirmative defenses were appropriately set forth at the pleading stage; defendants must err on the side of including certain defenses in their answer to preserve their right to pursue those defenses later in the case. Usually, defendants must prepare their answers and choose their affirmative defenses before they have the opportunity to investigate a plaintiff's claims or conduct discovery to determine whether

2

certain defenses apply.  Also, as defendants argue, of the affirmative defenses raised in their answer, they are pursuing only qualified immunity in their motion for summary judgment.

## II. MOTIONS FOR SUMMARY JUDGMENT

A.    Undisputed Facts[2]

1.    Parties

Plaintiff Timothy Wilks has been incarcerated at Waupun Correctional Institution (Waupun) since February 3, 1992. Defendants Craig Coda, John Dahlke, Linda Alsum-O'Donovan, Meli, and Muenchow were all employees of the Wisconsin Department of Corrections (DOC) who worked at Waupun in 2014.  Coda was a correctional officer whose duties included processing incoming packages, Dahlke was a Property Sergeant, Alsum-O'Donovan was the Program Support Supervisor, Meli was the Security Director, and Muenchow was an Institution Complaint Examiner.  Defendant Welcome Rose worked at the DOC's Central Office in 2014 as a Corrections Complaint Examiner.

2.    Plaintiff's Earlier Lawsuit Settlement

In 2008, plaintiff sued several Waupun staff members alleging the prison's interference with his efforts to publish religious books he had written violated his rights under the First Amendment's free exercise and freedom of speech clauses, the Fourteenth Amendment's equal protection clause, and the Religious Land Use and Institutionalized Persons Act.  This lawsuit was settled in 2010.  The terms of the settlement included an

---

[2] The material facts are undisputed and come from plaintiff's Proposed Findings of Fact (Doc. 22) and defendants' Proposed Findings of Fact (Doc. 27).  To the extent the court has included proposed findings of fact to which plaintiff objected, it has concluded that plaintiff did not submit admissible evidence to contradict those proposed findings of fact.

agreement that Waupun or DOC personnel would review the books plaintiff wanted to publish and an agreement that plaintiff would be permitted to publish his current and future books if the content (1) did not revictimize the victim, (2) did not result in him profiting from his crime, (3) was consistent with rehabilitation and treatment, and (4) did not include the type of publication that inmates not receive under Wis. Admin. Code § DOC 309.05(2)(b). On August 3, 2010, then Waupun Warden Thurmer wrote to plaintiff and advised him that his three written works had been reviewed and could be sent to a publisher.

The settlement agreement also provided that Waupun and/or the DOC would develop a policy that would guide staff members in making publication decisions in the future. In 2011, Waupun adopted a written procedure that provided inmates with guidelines for writing and seeking publication of written works. The Waupun publishing policy provides that "[a]n inmate may prepare a manuscript . . . for publication while in the custody of the Department of Corrections." (Doc. 27, ¶ 18.) The policy defines "publish" as "[t]he process of production and dissemination of literature or information–the activity of making information available for public view." *Id.* ¶ 19. The policy states that any inmate who receives payment from a publication must direct the payment to the Institution Financial Program Supervisor and otherwise comply with state law regarding inmate deposits and trust accounts.

Waupun may not prohibit publication of a manuscript on the basis of its general appeal to a particular ethnic, racial, or religious audience, or because of the political beliefs expressed therein. The policy states that an inmate whose manuscript has been approved by the institution may submit unsealed mailings of manuscripts to a staff member

4

designated by the warden to oversee the publication process, with appropriate disbursements. The receipt of publications, including publications authored by other inmates, is governed by DOC 309.04 and 309.05. That an inmate's manuscript has been published does not mean that the manuscript will be approved for receipt by other inmates. Additionally, inmates who author publications may not encourage other inmates to purchase their publications. The policy says: "General correspondence with individuals outside the prison about an inmate's writing is allowable provided it does not attempt to circumvent prison rules regarding inmate publication." (Doc. 27, ¶ 25.)

      3.    Plaintiff's Publication Contract

In April 2011, plaintiff entered a "Print on Demand Publishing Agreement" with RoseDog Books, a publishing company that charges authors a fee to perform services including printing and limited promotional activities. *Id.* ¶ 26. The contract pertained to plaintiff's book entitled, "The Holy Ghost Christ's Past, Present, and Future Revelations of the Holy Spirit–God's Eternal Life Evolution." *Id.* ¶ 27. Under the contract, RoseDog agreed to create and print three hundred full-color direct-mail marketing postcards that contained a copy of the book's cover image and back "ad copy" (About the Author and About the Book information) along with the book ordering information. RoseDog would mail up to two hundred of the postcards to the author's personal mailing list, send the author a personal supply of the direct mail pieces, and keep the balance of the three hundred postcards for possible future use.

      4.    Marketing Postcards

In 2014, RoseDog Books mailed plaintiff one hundred book marketing postcards. The mail room at Waupun received the postcards but withheld them from plaintiff as

5

contraband. On September 16, 2014, plaintiff received a notice signed by Coda indicating that marketing postcards sent to plaintiff by RoseDog Books had been deemed contraband and would not be allowed in the prison. Per DOC policy regarding disposal of contraband, plaintiff was instructed to choose a method of disposal of the marketing postcards. Plaintiff initially chose to ship the property out to a civilian but later changed his mind and indicated that he desired that the property be held pending his filing of a grievance challenging the contraband designation.

On September 17, 2014, plaintiff submitted an Information Request asking that he be allowed to have the marketing postcards. Dahlke responded on September 18, 2014, stating that the items were not allowed because they were "a fill in the blank order form." (Doc. 27, ¶ 32.)

Plaintiff submitted another Information Request on September 19, 2014, disputing Dahlke's characterization of the forms as "fill in the blank order forms." *Id.* ¶ 33. Alsum-O'Donovan responded on September 22, writing:

> If you have non-inmate persons you want to send the cards to, you can address your embossed [postage paid] envelopes and [the Property Department] can mail them out individually. Nothing in property or mail policies allows inmates to have their own advertising or promotional materials.

*Id.* Alsum-O'Donovan initially averred that she intended her response to be a compromise under which plaintiff would be allowed to send his promotional materials to someone outside the prison for mailing to potential customers. He would not be allowed to possess the marketing postcards within the institution or to mail the postcards directly to customers from the institution.

6

Alsum-O'Donovan was concerned that if the marketing postcards were counted as correspondence, plaintiff could only have twenty-five cards and no other letters in his property. She was also concerned that Waupun staff would find the postcards in the possessions of other inmates because they are easy for plaintiff to distribute within the institution, even though that is prohibited under Waupun's publishing policy.

Plaintiff interpreted Alsum-O'Donovan's proposal as suggesting that he could address the one hundred envelopes in his cell and mail room staff would stuff the marketing postcards into the envelopes and mail them for him. In plaintiff's view, this would avoid the problem of having the postcards in his cell and potential distribution within the institution.

Alsum-O'Donovan understood that plaintiff claimed to need the postcards to advertise the books, he had previously been allowed to publish. She was trying to find a way for plaintiff to advertise his books that would follow the rules about not advertising to other inmates. Alsum-ODonovan believed she was doing plaintiff a favor by coming up with the arrangement noted in her September 22 response. She had talked to Meli, and he had approved her proposal.

On September 22, 2014, plaintiff submitted an Information Request asking if the mail room would honor Alsum-O'Donovan's arrangement. Dahlke responded on September 24 that the arrangement would be honored.

Nevertheless, on September 24, 2014, plaintiff submitted an Information Request to Alsum-O'Donovan stating that he believed the prohibition on his possession of the advertising materials interfered with his ability to "effectuate or perfect [his] book's market publishing interests by mail." (Doc. 27, ¶ 40.) He further stated:

Case 2:15-cv-01053-CNC   Filed 03/28/17   Page 7 of 19   Document 41

> [M]y interest in printing, possessing, and mailing such book marketing materials should not be interfered with, whether I directly print, possess, or mail the materials for marketing purposes as my publisher asked or whether my publisher mails the materials to me for mailing in honor of our promotion marketing agreement . . . . I must be able to print, possess, and mail my [own] marketing materials from my cell, as long as I'm not distributing them to other inmates in violation of the WCI-DAI publishing policy which forbids such distribution.

*Id.* Alsum-O'Donovan responded the next day. She told plaintiff she was not interested in debating, that the Property Department was being very reasonable with him, and that if he wanted to pursue his argument, he was well aware of the complaint process in place for him to do so.

     5.    Inmate Complaint Process

Plaintiff filed Offender Complaint WCI-2014-19280 challenging the denial of his mail. He wrote, "[Dahlke and Alsum-O'Donovan] are both depriving me of my federal constitutional and state administrative rights to perfect my book publishing interests." *Id.* ¶ 42. Although plaintiff had been allowed to have the postcards mailed to someone outside the prison to use for their marketing purposes, or mailed to potential customers, he demanded that Dahlke and Alsum-O'Donovan allow him to possess the postcards and that he be allowed to mail them directly to promote the book.

Muenchow recommended dismissal of plaintiff's complaint "regarding book order forms seized on arrival" because Alsum-O'Donovan had already responded to plaintiff and had correctly kept plaintiff from possessing the materials. *Id.* ¶ 43. Muenchow wrote: "Though inmate Wilks may have previously sought and obtained permission to write and seek publication of works, this does not entitle him to engage in the marketing, sales or distribution of the publication within the institution. Use of and distribution of order forms

8

for the publication within the institution would certainly be contrary to DOC 303.32." *Id.* Warden William Pollard dismissed plaintiff's complaint based on Muenchow's recommendation. *Id.*

Plaintiff appealed the dismissal of his complaint and Muenchow's framing of the issue. He argued that he had a "substantive first and fourteenth amendment constitutional as well as WCI-DOC rule liberty right to directly exchange correspondent communications of mail containing book market promotional order form materials with his publishers and civilians." *Id.* ¶ 44. Plaintiff also argued that mail room staff and Alsum-O'Donovan had already read the terms of the publishing agreement and "knew . . . that its terms expressed the expectation of such mail distribution of marketing materials to civilians." *Id.*

Corrections Complaint Examiner Welcome Rose recommended dismissal of plaintiff's appeal; she noted that the prohibition on plaintiff's possession of the order cards was proper and further that the compromise proposed by Alsum-O'Donovan and approved by Meli "cannot be implemented" because DOC 303.36 "doesn't allow it." *Id.* ¶ 45. Rose concluded: "There is no authority granted in the administrative rules to allow an inmate permission to market a publication while in prison if the publication (the enterprise) did not exist prior to the inmate's sentencing." *Id.* The DOC Secretary dismissed plaintiff's appeal based on Rose's recommendation.

In March 2014, plaintiff submitted an Information Request at Waupun stating that he disagreed with the Secretary's final decision but, given the decision, the one hundred cards that had been held should be destroyed because the decision renders them "useless." *Id.* ¶ 45. Alsum-O'Donovan responded that she discussed the issue with Meli,

9

that Meli had no interest in rehashing the Secretary's decision, and that the cards would be destroyed in accordance with plaintiff's instruction.

6.      Mail and Enterprise Policies at Waupun

Incoming mail at Waupun is screened to ensure that contraband, including illegal drugs, weapons, and any other items not allowed under prison rules, is not entering the prison.  Outgoing mail is screened to ensure inmates are not accomplishing any criminal or otherwise prohibited acts through the use of the mail.

To screen the mail effectively, two staff members are assigned to the mail room. The more inmate mail there is, the greater the staffing needs in the mail room.  If additional staff is not available, the existing staff must work faster, thereby increasing the possibility of mail screening errors.

Allowing inmates to mail marketing materials related to an inmate's business venture directly to members of the public poses a risk that inmates may attempt to defraud or otherwise take advantage of the public.  Protection of the public is a core function of the DOC.  Allowing inmates to engage in business activities also poses the risk of disputes between inmates and members of the public, thereby further entangling the prison in inmate business activities.  It is for these reasons that prison administrators generally prohibit inmate business activities.

B.      Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A.,*

10

*Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

C.     Analysis

In his motion for summary judgment, plaintiff contends that he is entitled to summary judgment because there are no material facts in dispute and defendants had no legitimate penological interest in denying him the right to possess and distribute marketing materials advertising his published books. He also presents arguments regarding due process and retaliation claims, which the court did not allow him to proceed on at screening.

In their motion for summary judgment, defendants maintain that the decision not to allow plaintiff to possess the marketing materials in his cell survives under both possible

11

standards. They also argue that they are entitled to qualified immunity and that plaintiff was not allowed to proceed on a due process claim or a retaliation claim.

As mentioned above, the court will consider only the First Amendment claim that plaintiff was authorized to pursue at screening. The court did not allow plaintiff to proceed on due process or retaliation claims.

1.      First Amendment Legal Standard

The parties disagree regarding whether the decision to label the marketing postcards contraband affected plaintiff's right to incoming mail, which would be analyzed under *Turner v. Safley*, 482 U.S. 78, 89 (1987), or his right to outgoing mail, which would apply the standard set forth in *Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974).

Under *Turner*, restrictions are permissible if they are "reasonably related to legitimate penological interests." 482 U.S. at 89. The *Turner* test involves four factors: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *Id.* at 89-90. In applying these factors, the court may not substitute its judgment for that of prison officials, but must "accord substantial deference" to their professional judgment. *Jackson v. Frank*, 509 F.3d 389, 391 (7th Cir. 2007) (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)).

Under *Procunier*, (1) "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression"; and (2)

12

"the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." 416 U.S. at 413-14. In *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989), the Supreme Court limited the holding in *Procunier* to outgoing mail, and applied the more relaxed standard set forth in *Turner* to incoming mail. The Seventh Circuit recognized in *Koutnik v. Brown*, 456 F.3d 777, 784 (7th Cir. 2006), that censorship of outgoing mail was governed by *Procunier*.

2. Regulation at Issue

The restriction at issue is pursuant to Wis. Admin. Code § DOC 303.32 or Wis. Admin. Code § DOC 303.36. The former was in place when the marketing postcards arrived in September 2014 and was cited by Muenchow; Rose cited the latter which was implemented in January 2015, prior to her decision regarding plaintiff's appeal.

Section DOC 303.32 provides, in relevant part:

> (1) Any inmate who engages in a business or enterprise, whether or not for profit, or who sells anything except as specifically allowed under other sections is guilty of an offense, except for the following situations:
>
> (a) An inmate who was the owner or part owner of any business or enterprise prior to sentencing may communicate with the inmate's manager or partner concerning the management of the enterprise or business.
>
> (b) An inmate may write or seek publication of works in accordance with these rules and institutional policies and procedures.

The relevant portion of § DOC 303.36 says:

> (1) Any inmate who engages in a business or enterprise, whether or not for profit, or who sells anything except as specifically allowed under other sections is guilty of *enterprises and fraud*, except for the following situations:

13

(a) An inmate who was the owner or part owner of any *lawful* business or enterprise prior to sentencing may communicate with the inmate's manager, partner, *or attorney* concerning the management of the enterprise or business.

(b) An inmate may write or seek publication of works in accordance with these rules and *department policy*.

*Id.* (changes noted in italics). Substantively, these provisions are the same for the purposes of analysis under *Turner* and *Procunier*.

3.    *Turner*

The court will now consider the restriction on plaintiff's ability possess the marketing postcards under the *Turner* factors. 482 U.S. at 89-90. First, prohibiting plaintiff from possessing and directly mailing marketing postcards from his prison cell is "reasonably related" to the "legitimate penological interests" of protecting the public and maintaining prison security and order. *See id.* at 89. Prison staff monitor incoming inmate mail for contraband and outgoing mail for potential criminal activity. Allowing inmates to use the mail to conduct business activities can strain limited prison resources and make the monitoring of inmate mail less effective, more burdensome and problematic.

Plaintiff seems to believe that the Waupun publishing policy creates an enforceable right and that the ability to publish written works means inmates should be allowed to take any and all actions in marketing their works, even if they violate other DOC regulations. However, the state did not create for prisoners a right to publish their works, and it is justified in regulating what prisoners may do in attempts to publish their works.

The policy allowing inmate publication is an exception to the DOC's ban on enterprise, and it would be an absurd interpretation of the exception to presume that the

14

ability to "seek publication" includes the marketing of a work after its publication.  This is especially true because Waupun's publication policy allows "[g]eneral correspondence with individuals outside the prison about an inmate's writing," but does not mention other types of correspondence, such as solicitations to purchase published works.  (Doc. 27, ¶ 25.) Although the policy's definition of "publish" includes "[t]he process of production and dissemination of literature or information–the activity of making information available for public view," *id.* ¶ 19, prisoners are allowed only to seek publication, not to effect it.

Second, plaintiff retained alternatives for exercising his right to seek publication of his written works, which did not necessarily include a right to market his published works for sale.  For example, plaintiff could have secured a publisher that marketed its products. He also could have had others outside the prison (a paid service, friend or family member) to distribute marketing postcards to potential customers.

Plaintiff claims he had to destroy ninety-nine of one hundred of the postcards worth $33.00 each (the price of his book), a total value of $3,267.00.  However, he had the option of mailing the postcards to someone outside the prison for distribution or safekeeping. Although plaintiff argues that he did not have the money to pay someone to mail the postcards for him, hiring someone to distribute them was not the only option if he mailed them out of the prison.  He could have mailed them to a friend or family member who might have mailed them for him at no cost, or who simply could have held them for safe keeping. Hence, the court is not persuaded by plaintiff's argument that he had to end his publishing contract because he could not mail marketing postcards to civilians from prison.

Third, accommodating plaintiff's request would create a significant burden on prison administration.  If inmates were allowed to send marketing materials for books from their

cells, it would be necessary for prison officials to spend additional time screening outgoing mail to determine whether inmates were attempting to victimize the public or engaging in impermissible enterprise. Even the compromise originally proposed by Alsum-O'Donovan and approved by Meli would have imposed a burden on the mail room staff and likely would have been a one-time accommodation for plaintiff and not a sustainable policy. This is borne out by Rose's determination that the compromise was contrary to § DOC 303.36.

Fourth, the ban on inmates conducting business from their cells does not infringe any right, and defendants were justified in not allowing plaintiff to possess and/or mail the marketing postcards. To the extent there is a right to write and seek publication of written works, that right does not include a right for inmates to market works themselves from their prison cells. Not allowing prisoners to conduct business is "a permissible restriction on prisoners' residual freedom." *King v. Federal Bureau of Prisons*, 415 F.3d 634, 636 (7th Cir. 2005).

Plaintiff argues that the defendants presented different reasons for the denial of his marketing postcards that were inconsistent with each other. He also complains that Alsum-O'Donovan did not share all of her reasons for denying him possession of the marketing postcards with him. Regardless, these arguments do not undermine the legitimacy of the decision to bar plaintiff from possessing or mailing the marketing postcards.

3.    *Procunier*

The court also concludes that limiting an inmate's ability to conduct business from his cell "further[s] an important or substantial governmental interest" and impose a limitation "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier*, 416 U.S. at 413-14. Protecting members of the

16

public who receive prisoner mail from being victimized by unauthorized content, protecting security at the institution by not allowing inmates to victimize people by mail, solicit other inmates, or engage in unauthorized business enterprise, and preserving limited prison resources are all substantial government interests. The restriction precluding plaintiff from possessing marketing postcards in his cell or mailing the postcards directly from prison is not greater than is necessary to protect those governmental interests. To allow plaintiff to possess or send out those postcards could result in members of the public or other prisoners being victimized by solicitation requests. It could also increase the mail room staff necessary to screen incoming and outgoing mail. This would be especially true if any number of the more than twelve hundred inmates at Waupun attempted to conduct business through the mail.

Additionally, unlike the regulations at issue in *Procunier*, the restriction here has nothing to do with the suppression of expression. The ability to write and seek publication of written works does not include the right to directly sell those works.

### 4. Qualified Immunity

Even if the court concluded that defendants violated plaintiff's constitutional rights when they did not allow him to possess and mail marketing postcards for his books, defendants would be entitled to qualified immunity from monetary damages for the decisions they made. Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and

17

(2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir.2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

Courts may address the two prongs of qualified immunity in either order. *Pearson*, 555 U.S. at 236. A right is clearly established if "a reasonable official would have understood what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, ___, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotations and brackets omitted).

Plaintiff points to no case establishing an inmate's constitutional right to market or sell his published works. On the other hand, "a prisoner has no right to conduct a business while incarcerated." *French v. Butterworth*, 614 F.2d 23, 24 (1st Cir. 1980). In *Procunier*, the Supreme Court cited approvingly a Federal Bureau of Prisons Policy Statement that contained a prohibition against inmates conducting businesses. 416 U.S. at 414 n. 14. And, as mentioned above, the Seventh Circuit in *King* posited that not allowing prisoners to conduct business is "a permissible restriction on prisoners' residual freedom." *King,* 415 F.3d at 636. Therefore, defendants are entitled to qualified immunity respecting this claim. Consequently,

IT IS ORDERED that plaintiff's motion for summary judgment (Doc. 20) is DENIED.

IT IS FURTHER ORDERED that plaintiff's motion for judgment on the pleadings (Doc. 24) is DENIED.

IT IS FURTHER ORDERED that defendants' motion for summary judgment (Doc. 26) is GRANTED, and this case is DISMISSED WITH PREJUDICE.

18

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 28th day of March, 2017.

BY THE COURT

s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
U.S. District Judge